STATE OF NORTH CAROLINA
v.
MARK BRYAN KIDD
No. COA08-273
Court of Appeals of North Carolina.
Filed December 16, 2008
This case not for publication
Attorney General Roy Cooper, by Assistant Attorney General Catherine M. Kayser, for the State.
Paul F. Herzog for defendant.
ELMORE, Judge.
On 8 March 2007, a jury convicted Mark Bryan Kidd (defendant) of first degree sexual offense with a child under thirteen by cunnilingus and attempted first degree sexual offense with a child under thirteen by attempted anal intercourse. On 9 March 2007, the trial court entered the judgments and sentenced defendant to a term of 240 to 297 months' imprisonment. Defendant appeals these convictions.
Defendant and Billy Jo Swann dated and lived together for nearly twelve years. Defendant evicted Swann from his home in 2002, effectively ending their romantic relationship. A friendship ensued, however, and Swann moved into a house on defendant's street. In the summer of 2006, Swann had custody of three grandchildren, including ten-year-old Jane and nine-year-old John.[1] Defendant often volunteered to keep the children at his house while Swann worked, and Jane and John spent Saturday nights at his house. The children had a close relationship with defendant and called him "Grandpa Mark," "Uncle Mark," or "Mark." They fished, went to the beach, rode four-wheelers, and did other "fun things" together.
Swann testified that in July 2006, she saw John "humping" Jane and "in just a matter of seconds they flipped, and then [Jane] done him." Swann asked where they had learned the behavior and Jane told her that "Mark had been licking her down there." When Swann went to confront defendant, Jane began screaming "Don't, don't, don't. We don't want you to." Swann then approached defendant and said, "I think you know what I'm going to talk to you about." She testified that defendant "threw his hands up, like, whatever. Why do you think I haven't slept in four months?" Swann replied, "Do you know what my granddaughter just told me what you've been doing?" He responded, "Do what you have to do. Call the law. Do what you have to do." Swann also testified that defendant told her that defendant's twenty-one-year-old daughter knew about the incident. When Swann confronted the children later that day, John told her that Jane "had licked his private." The children also related sexual incidents involving defendant.
During her testimony, Jane described a number of different sexual encounters with defendant. She testified that defendant had touched her "front privates" (or vagina) with his finger and mouth. She testified that she fell asleep while watching a movie with defendant and when she woke up, her pajamas were down around her knees and she felt "something touching [her] privates." Jane identified the "something" as defendant's finger.
Jane testified that later that summer, she and her two brothers were watching a movie in defendant's room and she again fell asleep. When she woke up, she felt something on her "front private" and "moved it away." This time, she moved away defendant's head. She testified that she had felt his tongue on the outside of her vagina and told him to stop as she moved his head away from her. Jane testified that defendant touched her vagina with his tongue "[l]ike, five times." When asked, Jane testified that she kept track of these incidents "[s]o I could tell my grandma and my therapist if I ever go to one."
Jane testified that defendant also rubbed his penis against the outside of her vagina. Jane saw that "[t]here was white stuff coming out" of his penis that went onto her leg, which defendant cleaned off with a towel.
She testified that he put his penis into her "back private." Again, she was asleep and awoke to her pajamas down around her knees and defendant inserting his penis into her anus. She tried "to squeeze [her] butt together . . . [so] his front private will not go in [her] butt." She testified that her "back private" hurt as a result. Another time, she awoke with her pajamas pulled down and defendant "put[ting] his mouth on [her] back private." Her description was that defendant "was, like, eating my butt." Yet another time, Jane awoke with her pajamas around her ankles to defendant "put[ting] his finger in [her] butt hole once or twice."
Jane testified about an incident that involved John and an instrument that she described as "[l]ike a telescope" but "longer and littler." The instrument had a light at one end and defendant used it to look at Jane's "butt" for a few seconds and at John's "butt" for longer. Jane also testified that defendant threatened to "whup" John and her if she did not "touch [John's] front private" with her mouth. Although Jane did not want to, she touched John's penis with her mouth for "[o]ne second or two" and then "went in the bathroom and spit in the toilet." She testified that she was afraid that defendant would "whup" her because he had "whupped" her once and regularly "whupped" John and her other brother. She testified that she never told her grandmother about the various sexual incidents at defendant's house because she was afraid that he would "whup" her or hurt her family if she told.
After the swimming pool incident, both Jane and John spoke with therapists, social workers, and police officers. One officer, Detective Karen Battle, interviewed Jane on 21 July 2006. During that interview, Jane told Detective Battle that defendant had touched her front and back privates ten times during June and July 2006. According to Detective Battle, Jane described how defendant had rubbed his penis on her vagina, put his mouth on her vagina, slightly inserted his penis between her butt cheeks, and put his mouth on her breasts. She also told Detective Battle that defendant had a scar on his inner leg near his penis. Defendant first argues that the trial court erred by allowing Detective Battle to testify about what Swann told her that defendant had said when Swann confronted him after the swimming pool incident. Detective Battle testified that
[Swann] told me she confronted [defendant] and said that she knew he had been touching [Jane] and [John] in a sexual way.
* * *
She told me that he replied to her by saying, quote, Why do you think I have not slept in four months?
* * *
She said that he told her that she would not understand and that they should lock him up for what he has been doing.
Defense counsel objected and was overruled. Defendant argues that Detective Battle's statement, "they should lock him up for what he has been doing," went "far beyond" the permissible boundaries of corroborative evidence and was so prejudicial that the trial judge should have intervened ex mero motu.
Our courts have long held that a witness's prior consistent statements may be admissible to corroborate the witness's in-court testimony. Corroborative testimony is testimony which tends to strengthen, confirm, or make more certain the testimony of another witness. Where corroborative testimony tends to add strength and credibility to the testimony of another witness, the corroborating testimony may contain new or additional facts. Variances in detail between the generally corroborative testimony and the testimony of another witness reflect only upon the credibility of the statement. Whether testimony is, in fact, corroborative is a factual issue for the jury to decide after proper instruction by the trial court.
State v. Dunston, 161 N.C. App. 468, 472, 588 S.E.2d 540, 544 (2003) (quotations and citations omitted). However, "[i]f a prior statement of the witness, offered in corroboration of his testimony at the trial, contains additional evidence going beyond his testimony, the State is not entitled to introduce the `new' evidence under a claim of corroboration[.]" State v. Warren, 289 N.C. 551, 557, 223 S.E.2d 317, 321 (1976) (quotations and citations omitted). In Warren, the Supreme Court held that the corroborating witness's testimony went "far beyond" the witness's testimony. Id. at 556, 223 S.E.2d at 320. There, the witness, Wyatt, "only testified that [the] defendant and his brother Harold decided to rob the old man and that Harold had a 2 X 4 and [the] defendant had a knife." Id. The corroborating witness, Crawford, testified that the defendant told him that he and Harold planned to rob and kill the old man, that Harold actually hit the old man with the 2 X 4, that the defendant cut the old man's face, chest, and throat, and that the defendant and Harold told him that they planned to kill a second man. Id., 223 S.E.2d at 320-21.
In contrast, Detective Battle's corroborating testimony did not go "far beyond" Swann's. The addition of "they should lock him up for what he had been doing" was a variance in detail and did not constitute "new" evidence.
Defendant next argues that the trial court erred by allowing Detective Battle to testify to the following:
There was one occasion she disclosed where he made her take her hand and rub his penis, front private, until what she described as a white clear  or white warm liquid came out. She also disclosed that there were occasions where Grandpa Mark would have her lay on the floor in the bedroom and take her shirt off and then he would place his lips and mouth on her breasts and 
(Emphasis added.) At this point, defense counsel objected because the testimony was not corroborative. The trial court overruled defendant's objection and Detective Battle continued:
And she also disclosed that he would take off her pants and place his mouth on her vagina. She disclosed that  she further disclosed that when Grandpa Mark had rubbed his penis between her butt cheeks, near her back, as I was describing before, that a warm clear liquid came out also on her back and that she would have to go get a towel and wipe it off.
At the close of all of the evidence, the trial court dismissed the charge that defendant had committed an indecent liberty by placing his mouth on Jane's breasts. Defendant argues that even though the related charge was dismissed, he was still substantially prejudiced by Detective Battle's testimony. We disagree.
A trial court may properly admit corroborating testimony by an investigating officer if the testimony "tend[s] to strengthen and add credibility to [the victim's] trial testimony," even if the officer's testimony "includ[es] additional facts not referred to in [the victim's] testimony[.]" State v. Ramey, 318 N.C. 457, 470, 349 S.E.2d 566, 574 (1986) (citation omitted). Here, as in Ramey, Detective Battle's "testimony clearly indicated a course of continuing sexual abuse by the defendant." Id. Accordingly, we hold that the trial court did not err by admitting the objected-to portion of Detective Battle's testimony as corroborative. Defendant next argues that it was plain error for the trial court to allow Jeanne Arnts to testify that Jane had told her that she wanted to harm herself. Arnts, a licensed clinical social worker, interviewed both Jane and John and completed a "Trauma Symptom Checklist" with respect to Jane. Arnts testified that this fifty-four-item checklist is "a standardized instrument that's used in clinics across the country, and there are numerous articles in professional journals about its use and utility." Arnts testified that Jane had "endorsed" the question about wanting to hurt herself, but not the question about wanting to kill herself. Arnts testified that when she asked Jane about those feelings, "she reported . . . nonlethal attempts to hurt herself, to self-injure." Arnts elaborated:
[S]he wasn't talking about taking a knife or taking a gun or overdosing on pills. She was talking about hitting herself and biting herself, which is much more typical for children of her age. Usually it's very unusual for children under the age of 12 to use lethal  you know, use potentially lethal forms to attempt to hurt themselves. And so she was really just reporting self-injury and that after she did it that she felt fine. And, again, that seemed consistent with children who use self-injury to make themselves feel better. She wasn't trying to actually hurt herself for the purpose of doing away with her life; she was trying to hurt herself because that served as a way to deal with her emotional pain; that once she hurt herself physically, it helped release the emotional pain she was having.
Defense counsel did not object to Arnts's testimony, so defendant now asserts plain error. "In criminal cases, a question which was not preserved by objection noted at trial . . . may be made the basis of an assignment of error where the judicial action questioned is specifically and distinctly contended to amount to plain error." N.C.R. App. P. 10(c)(4) (2007). "Plain error is error `so fundamental as to amount to a miscarriage of justice or which probably resulted in the jury reaching a different verdict than it otherwise would have reached.'" State v. Leyva, 181 N.C. App. 491, 499, 640 S.E.2d 394, 399 (2007) (quoting State v. Bagley, 321 N.C. 201, 213, 362 S.E.2d 244, 251 (1987)).
Although we agree that Arnts's testimony did not corroborate Jane's trial testimony, it was nevertheless relevant and admissible under the medical diagnosis or treatment exception to the hearsay rule. Rule 803(4) provides that the following are not excluded by the hearsay rules, even though the declarant is available as a witness:
Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensation, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to the diagnosis or treatment.
N.C. Gen. Stat. § 8C-1, Rule 803(4) (2007). This rule "requires a two-part inquiry: (1) whether the declarant's statements were made for purposes of medical diagnosis or treatment; and (2) whether the declarant's statements were reasonably pertinent to diagnosis or treatment." State v. Hinnant, 351 N.C. 277, 284, 523 S.E.2d 663, 667 (2000) (citations omitted).
To satisfy this inquiry, the State had to "establish that the declarant had the requisite intent by demonstrating that the declarant made the statements understanding that they would lead to medical diagnosis or treatment" and that the declarant's statements were reasonably pertinent to medical diagnosis or treatment such that the declarant had a "treatment-based motivation to be truthful." Id. at 287, 523 S.E.2d at 669. Here, Arnts interviewed Jane in an examination room at the Center for Child and Family Health in Durham. Arnts informed Jane that she was in a doctor's office and that it was important to be truthful so that Arnts and the doctor did not make mistakes. Arnts assessed Jane's ability to understand what it means to tell the truth. The State satisfied the first prong of the Hinnant inquiry by showing that Jane understood that her statements would lead to medical diagnosis or treatment.
As to the second prong, Arnts recommended trauma-focused mental health treatment as a result of Jane's responses to the checklist and had Jane complete a "No Self-Harm Contract"; Jane ultimately received trauma-focused mental health treatment. Swann also received a copy of the contract so that she could help Jane address her feelings of self-harm. Arnts's testimony was relevant to the diagnosis and treatment of Jane's self-injurious behavior and properly admitted under Rule 803(4).
Defendant next argues that it was plain error for the trial court to allow Arnts to make the following statements during her testimony:
[T]here's the clinical range, which means we're more concerned, and we would definitely want this child to be followed up in therapy with regard to that symptom. So within the clinical range . . . the scales are anxiety, depression, anger, post traumatic stress, dissociation, and sexual concerns. And then there's a couple of subscales under some of those. . . . [S]o [Jane] was in the clinical range on sexual concerns and in particular in terms of the subscale of sexual distress.
* * *
[I]n general, in that [Jane] was endorsing sexual concerns and distress and that she was endorsing symptoms associated with posttraumatic stress; that that  her responses appeared to be  were consistent with [how] . . . sexually abused children would typically respond.
* * *
The recommendations [for Jane] were basically the same as for her brother; that she have no contact with the person that they named as the offender[.]
* * *
I expect the child to be able to tell me the context in which [a person touched their private part]; that it provides credibility  you know, if the child says that  you know, there could be many other explanations for why a child's private part  maybe the child was complaining of pain. Maybe someone was helping the child wash. What is the context in which this occurred? Was this done for sexual gratification? And is the child able to provide a description of all those details surrounding the incident?
That she reported age inappropriate sexual knowledge in that she described the white stuff coming out of his private part and some of it got on her and it felt slimy. And her history of sexual-acting-out behavior is what we  authorities in the field consider a red flag. Now, certainly not every child who acts out sexually is a sexually abused child. We know that that's not true, but we also know that the primary reason associated with sexual acting out in children is sexual abuse so that  it's support. The fact that she has acted out sexually supports her disclosure that she has been sexually abused. In and of itself it doesn't mean that that's happened but it is a supporting factor.
* * *
As I noted earlier with the Trauma Symptom Checklist, as well as verbally in the interview, she reported emotional and behavioral symptoms associated with sexual abuse that are commonly reported by children who have histories of sexual abuse.
And that some of her reports about [defendant's] behavior were corroborated by her brother.
Defendant argues that this testimony constituted expert testimony by Arnts that Jane "was  in effect  sexually abused" and that Jane "was  in effect  credible." We disagree.
In a sexual offense prosecution involving a child victim, the trial court should not admit expert opinion that sexual abuse has in fact occurred because, absent physical evidence supporting a diagnosis of sexual abuse, such testimony is an impermissible opinion regarding the victim's credibility. However, an expert witness may testify, upon a proper foundation, as to the profiles of sexually abused children and whether a particular complainant has symptoms or characteristics consistent therewith.

State v. Stancil, 355 N.C. 266, 266-67, 559 S.E.2d 788, 789 (2002) (citations omitted; emphasis added). Here, Arnts laid a proper foundation as to the profiles of sexually abused children and opined only that Jane exhibited certain characteristics consistent with those profiles. Arnts did not opine that Jane had been sexually abused or that Jane was believable. Her testimony, if believed, could have helped the jury assess Jane's credibility but did not constitute impermissible opinions. See State v. Richardson, 112 N.C. App. 58, 65, 434 S.E.2d 657, 662 (1993) (stating that the testimony, "if believed, could help the jury understand the behavior patterns of sexually abused children and assist it in assessing the credibility of the victim"). Accordingly, the court did not err by admitting Arnts's testimony.
Finally, defendant argues that the trial court erred by allowing Beth Bernard, a licensed clinical social worker, to testify that Jane had told her that she wanted to harm herself. Defendant again argues that Bernard's testimony was not corroborative because it went "far beyond" Jane's trial testimony, which did not include any claims that she attempted or desired to harm herself. We disagree and hold that this evidence was admissible under Rule 803(3) as a description of Jane's then-existing mental and emotional state. Bernard is a member of the Sex Abuse Treatment Team at Wake County Human Services who works with victims of sexual abuse, their families, and juvenile sex offenders. She engaged in weekly therapy sessions with Jane during which she sought to allow Jane to express her thoughts and feelings about the abuse and to reduce any adverse symptoms, such as depression or anxiety. During the course of Jane's therapy, both Jane and Swann reported that Jane "was having difficulty going to sleep at night, having some thoughts about harming herself," and "feeling some sad feelings[.]" Defense counsel objected, but was overruled. Bernard testified that she recommended that Jane see a psychiatrist, who prescribed Zoloft for Jane.
Rule 803(3) excludes from the hearsay rule "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition such as intent, plan, motive, design, mental feeling, pain, and bodily health[.]" N.C. Gen. Stat. § 8C-1, Rule 803(3) (2007). "The evidence is admissible when the state of mind of the declarant is relevant and its probative value is not outweighed by the potential for prejudice." State v. Weeks, 322 N.C. 152, 170, 367 S.E.2d 895, 906 (1988). Here, Bernard's testimony was relevant and admissible to show Jane's then-existing state of mind, fear of defendant, and symptoms that she had experienced since disclosing the abuse. Moreover, Swann had already testified that she had seen Jane "take a pencil or a pen and be jabbing her leg." Accordingly, we hold that the trial court did not err in admitting Bernard's testimony.
We hold that defendant received a trial free from any of the prejudicial errors that he preserved, assigned, and argued. Defendant has failed to show plain error in the jury's verdict or the judgment entered thereon.
No error.
Judges TYSON and CALABRIA concur.
Report per Rule 30(e).
NOTES
[1] "Jane" and "John" are not the children's real names.